United States District Court
for the
District of Massachusetts
Civil Action No. 1:23-cv-13116
_____

Louise Harris Daddeh,
Personal Representative of the Estate of Moses Harris,

Plaintiff,

-vs-

Commonwealth of Massachusetts,
City of Lowell,
Lowell Police Department Officers John Doe 1, John Doe 2, and John Doe 3,
Lowell Fire Department Firefighters John Doe 4 and John Doe 5,
Massachusetts State Troopers John Doe 6, John Doe 7, John Doe 8, and John Doe 9,
Lowell Police Department Detectives John Doe 10 and John Doe 11, and
Massachusetts Environmental Police Officers John Doe 12 and John Doe 13,

Defendants.
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

1. Moses Harris's lifeless body was found in the Merrimack River near the intersection of River Road and Ravens Bluff in Andover, Massachusetts on March 7, 2021.

2. The last person to see Mr. Harris alive was Defendant Lowell Police Department Officer John Doe 1. Defendant-Officer John Doe 1 interacted with Mr. Harris in the early morning of December 19, 2020, nearly 3 months before his body was found in the Merrimack River.

3. Louise Harris Daddeh, the mother of Mr. Harris and Personal Representative of his Estate, now brings this action alleging Defendant-Officer John Doe 1 and the remaining Defendants are responsible for Mr. Harris's death.

**Jurisdiction and Venue**

4. This Court has subject matter jurisdiction over all claims in this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

5. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391.

**Parties**

6. Ms. Daddeh is a resident of the Commonwealth of Massachusetts and the Personal Representative of the Estate of Moses Harris.

7. The Commonwealth of Massachusetts is one of the United States of America.

8. The City of Lowell is a municipality located within Middlesex County in the Commonwealth of Massachusetts.

9. Defendants Commonwealth of Massachusetts and City of Lowell are referred to collectively as the "Institutional Defendants" as needed.

10. Lowell Police Department ("LPD") Officers John Doe 1, John Doe 2, and John Doe 3 are law enforcement officers employed by LPD. They acted at all relevant times as on-duty LPD police officers. They are sued in their individual and personal capacities.

11. Lowell Fire Department ("LFD") Firefighters John Doe 4 and John Doe 5 are firefighters employed by LFD. They acted at all relevant times as on-duty LFD firefighters. They are sued in their individual and personal capacities.

12. Massachusetts State Troopers John Doe 6, John Doe 7, John Doe 8, and John Doe 9 are law enforcement officers employed by the Massachusetts State Police Department of the Commonwealth of Massachusetts ("MSP"). They acted at all relevant times as on-duty Troopers. They are sued in their individual and personal capacities.

13. LPD Detectives John Doe 10 and John Doe 11 are law enforcement officers employed by LPD. They acted at all relevant times as on-duty LPD detectives. They are sued in their individual and personal capacities.

14. Massachusetts Environmental Police ("MEP") Officers John Doe 12 and John Doe 13 are law enforcement officers employed by the Commonwealth of Massachusetts. They acted at all relevant times as on-duty MEP officers. They are sued in their individual and personal capacities.

15. The law enforcement officer Defendants are collectively referred to as the "John Doe Defendants" as needed.

## Facts Alleged

16. At approximately 2:15 a.m. on Saturday, December 19, 2020, Moses Harris was in a vehicle registered to him parked in a parking lot near 850 Lawrence Street in Lowell, Massachusetts. The asphalt of the lot was mostly clear but surrounded by a substantial amount of snow. It was approximately 30 degrees Fahrenheit.

17. At the same time, Defendant-Officer John Doe 1 was investigating Mr. Harris's involvement in an alleged crime and traveled to the parking lot near 850 Lawrence Street.

18. Defendant-Officer John Doe 1 knew Mr. Harris was experiencing symptoms of a mental illness based on information he received from the dispatcher who dispatched him to locate and investigate Mr. Harris.

19. The dispatcher had received the information from Jerytza Montanez, who had called 911 for Mr. Harris's alleged involvement in a crime. Ms. Montanez told the dispatcher police should approach Mr. Harris cautiously because he was experiencing symptoms of a mental illness.

20. Defendant-Officer Doe 1 identified Mr. Harris's vehicle and parked his marked police vehicle behind and perpendicular to Mr. Harris's vehicle.

21. As Defendant-Officer Doe 1 was notifying the dispatcher of his discovery, Mr. Harris opened the front, driver's side door of his vehicle.

22. Defendant-Officer Doe 1 exited his vehicle.

23. Mr. Harris exited his vehicle and then slowly approached Defendant-Officer Doe 1 and his vehicle.

24. Defendant-Officer Doe 1, perceiving Mr. Harris to be a threat, withdrew his taser and displayed lasers on the ground in front of Mr. Harris.

25. Mr. Harris turned his body approximately ninety (90) degrees to the left, facing away from Defendant-Officer Doe 1 and toward the rear of the parking lot which was partially occupied by a construction zone along the Concord River.

26. As he turned, Mr. Harris raised both of his hands in the air and began walking toward the rear of the parking lot and the construction zone.

27. Defendant-Officer Doe 1 followed closely behind, matching Mr. Harris's pace.

28. After walking approximately thirty (30) feet from their vehicles, Mr. Harris began running toward the construction zone in the rear of the parking with Defendant-Officer Doe 1 in close pursuit.

29. Defendant-Officer John Doe 1 chased Mr. Harris to the bank of the Concord River.

30. Due to Defendant-Officer John Doe 1's actions, Mr. Harris ended up in the Concord River.

31. Mr. Harris was deathly afraid of water and did not know how to swim.

32. After Defendant-Officer John Doe 1 chased Mr. Harris to the bank of the Concord River, he told the LPD dispatcher that Mr. Harris was in the Concord River and gave his approximate location as near 576 Lawrence Street.

33. Defendant-Officer John Doe 1 lost sight of Mr. Harris approximately one hundred (100) yards along the Lawerence Street side of the Concord River. Defendant-Officer John Doe 1 told the dispatcher Mr. Harris's last location and his description, which included the articles of clothing Mr. Harris was wearing.

34. Defendant-Officer John Doe 1 never entered the Concord River in an attempt to rescue Mr. Harris nor made any other attempt to retrieve him from the river.

35. Mr. Harris was never seen alive again.

36. As the events between Mr. Harris and Defendant-Officer John Doe 1 were unfolding, Defendant-Officer John Doe 2 heard Defendant-Officer John Doe 1 notify dispatch of the foot chase and Mr. Harris being in the Concord River.

37. Defendant-Officer John Doe 2 also responded to 850 Lawrence Street, traced the path of Mr. Harris and Defendant-Officer John Doe 1, and encountered Defendant-Officer John Doe 1 along the edge of the Concord River.

38. Defendant-Officer John Doe 1 identified a group of trees along the Lawrence Street side of the river as Mr. Harris's location. Another marked police vehicle, containing Defendant-Officer John Doe 3, responded to 576 Lawrence Street to search for Mr. Harris.

39. Once Defendant-Officer John Doe 1 notified the dispatcher that Mr. Harris was in the Concord River, LFD dispatched an unidentified Fire Engine containing Defendant-Firefighters John Doe 4 and John Doe 5.

40. Two police dog units, one with Defendant-Trooper John Doe 6 and another with Defendant-Trooper John Doe 7, were also dispatched, along with a third Trooper, Defendant-Trooper John Doe 8, who was not accompanied by a police dog.

41. The MSP also dispatched its Air Wing to aid in the search, containing Defendant-Pilot John Doe 9.

42. Two detectives from LPD, Defendant-Detectives John Doe 10 and John Doe 11, also responded to aid in the search.

43. Finally, two officers from MEP, Defendant-Officers John Doe 12 and John Doe 13, also responded.

44. None of the John Doe Defendants ever entered either the Concord or Merrimack Rivers to rescue Mr. Harris.

45. The search conducted by the John Doe Defendants improperly centered on the area immediately surrounding the points at which Mr. Harris ended up in the Concord River and where he was last seen. At the time the search began, Mr. Harris had allegedly traveled approximately one hundred (100) yards within a short period of time in the direction of the current of the Concord River—south to north. And his body was found a quarter of a year later approximately 5 miles from where he ended up in Concord River and in the direction of the current of the Merrimack River—west to east.

46. The search was also improperly ended after only two (2) hours of searching. No additional searching was ever undertaken by Defendants.

47. Approximately two (2) years prior, a similar search and rescue mission ended differently.

48. The frigid night of January 3, 2018, Raveth Than jumped from the Aiken Street Bridge in Lowell into the Merrimack River.

49. Mr. Than could not swim but was able to float near the surface of the river.

50. A nearby man realized Mr. Than was in the river and called 911 for emergency assistance.

51. Police and firefights responded but did not enter the river to rescue Mr. Than.

52. The rescue crews then requested the MSP Air Wing to assist with Mr. Thanks rescue.

53. Troopers in a helicopter, despite the lack of equipment to make a water rescue, took extraordinary measures to daringly rescue Mr. Than: the pilot lowered the helicopter low enough that the skids it lands on were under water while another Trooper leaned out of the helicopter and grabbed Mr. Than.

54. Mr. Than was then rushed to Lowell General Hospital where he was treated and, eventually, released.

55. Mr. Harris did not enjoy the same effort or fate.

56. After Mr. Harris's disappearance, officials representing Defendant City of Lowell and LPD repeatedly refused to identify any of the John Doe Defendants despite their involvement in his disappearance. They refused to identify any of the John Doe Defendants even after public records requests were submitted to them. They also refused to provide any documentation, video, audio recordings, or any other information regarding Mr. Harris to his family, and they refused to communicate with Mr. Harris's family, including Ms. Daddeh, regarding his disappearance, whereabouts, or any further efforts to locate or rescue him.

57. On March 7, 2021, Mr. Harris's body was found in the Merrimack River near the intersection of River Road and Ravens Bluff in Andover, Massachusetts.

58. A month later, Tori Bedford, a journalist working for WGBH, a Boston-based news organization and member of Public Broadcasting System and National Public Radio, released an article detailing Mr. Harris's disappearance and the response from officials representing Defendant City of Lowell and LPD.

59. Ms. Bedford interviewed Lowell City Councilor John Leahy—then Mayor of Defendant City of Lowell—regarding Mr. Harris's disappearance.

60. During the interview, then-Mayor Leahy said the John Doe Defendants "follow[ed] a standard protocol" in their response to Mr. Harris's disappearance and described a similar incident which occurred in Lowell from years prior during which a person "fell in the river, and they didn't find his body for six months."

61. Consequently, at the time of Mr. Harris's disappearance, then-Mayor Leahy, the chief executive of Defendant City of Lowell, knew of a protocol in place pursuant to which the John Doe Defendants acted in relation to Mr. Harris's disappearance and knew the protocol had led to the disappearance and death of a person other than Mr. Harris.

62. Additionally, then-Mayor Leahy was aware, at the time of Mr. Harris's disappearance, that the John Doe Defendants were not properly trained or supervised in conducting search and/or rescue operations in the Concord and Merrimack Rivers.

## Count 1
**Common law wrongful death against all Defendants**

63. Ms. Daddeh incorporates by reference all prior paragraphs.

64. Defendants owed a duty of care to Mr. Harris.

65. Specifically, once Defendants intended to take Mr. Harris into custody and pursued him in order to do so, they owed a duty of care to Mr. Harris such that they were required to prevent Mr. Harris from experiencing serious bodily harm or death as a result of their custody or pursuit and to rescue him once he faced serious bodily harm or death as a result of their custody or pursuit.

66. Defendants breached that duty.

67. Mr. Harris died because of Defendants' breach of duty.

## Count 2
**Negligent wrongful death under G.L. c. 229, § 2(1), against all Defendants**

68. Ms. Daddeh incorporates by reference all prior paragraphs.

69. Defendants owed a duty of care to Mr. Harris.

70. Specifically, once Defendants intended to take Mr. Harris into custody and pursued him in order to do so, they owed a duty of care to Mr. Harris such that they were required to prevent Mr. Harris from experiencing serious bodily harm or death as a result of their custody or pursuit and to rescue him once he faced serious bodily harm or death as a result of their custody or pursuit.

71. Defendants breached that duty.

72. Mr. Harris died because of Defendants' breach of duty.

### Count 3
### Willful, wanton, or reckless wrongful death under G.L. c. 229, § 2(2), against all Defendants

73. Ms. Daddeh incorporates by reference all prior paragraphs.

74. Defendants owed a duty of care to Mr. Harris.

75. Specifically, once Defendants intended to take Mr. Harris into custody and pursued him in order to do so, they owed a duty of care to Mr. Harris such that they were required to prevent Mr. Harris from experiencing serious bodily harm or death as a result of their custody or pursuit and to rescue him once he faced serious bodily harm or death as a result of their custody or pursuit.

76. Defendants breached that duty and did so in a willful, wanton, or reckless manner.

77. Mr. Harris died because of Defendants' breach of duty.

### Count 4
### Loss of consortium under under G.L. c. 231, § 85X, against all Defendants

78. Ms. Daddeh incorporates by reference all prior paragraphs.

79. Ms. Daddeh is the parent of Mr. Harris.

80. At the time of his death, Mr. Harris was dependent on Ms. Daddeh for support.

81. Defendants seriously injured Mr. Harris.

82. Defendants are legally responsible for seriously injuring Mr. Harris.

**Count 5**
**Pain and suffering under under G.L. c. 229, § 6, against all Defendants**

83. Ms. Daddeh incorporates by reference all prior paragraphs.

84. Defendants owed a duty of care to Mr. Harris.

85. Specifically, once Defendants intended to take Mr. Harris into custody and pursued him in order to do so, they owed a duty of care to Mr. Harris such that they were required to prevent Mr. Harris from experiencing serious bodily harm or death as a result of their custody or pursuit and to rescue him once he faced serious bodily harm or death as a result of their custody or pursuit.

86. Defendants breached that duty.

87. Mr. Harris died because of Defendants' breach of duty.

88. Immediately preceding his death, Mr. Harris endured conscious pain and suffering because of Defendants' breach of duty.

**Count 6**
**Intentional or reckless infliction of emotional distress against all Defendants**

89. Ms. Daddeh incorporates by reference all prior paragraphs.

90. Defendants intended to inflict emotional distress on Mr. Harris and Ms. Daddeh or knew or should have known that emotional distress was likely to result.

91. Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized society.

92. Defendants' caused Mr. Harris's and Ms. Daddeh's emotional distress.

93. Mr. Harris and Ms. Daddeh suffered severe emotional distress of a nature that no reasonable person could be expected to endure it.

94. Specifically, in the three (3) years since Mr. Harris's death, Ms. Daddeh has endured daily, intense physical and emotional pain because of the loss of her son. Trauma resulting from her son's

death combined with the daily physical and emotional pain has negatively affected Ms. Daddeh's physical and mental health and resulted in intense pain and suffering. She has endured intense anxiety, depression, stress, and physical and emotional pain. She has had difficulty sleeping, eating, working, and socializing.

### Count 7
### Negligent infliction of emotional distress against all Defendants

95. Ms. Daddeh incorporates by reference all prior paragraphs.

96. Defendants owed a duty of care to Mr. Harris.

97. Defendants breached that duty.

98. Mr. Harris died because of Defendants' breach of duty.

99. Defendants' breach of duty caused Mr. Harris emotional distress.

100. Defendants' breach of duty and Mr. Harris's resulting death has caused Ms. Daddeh emotional distress.

101. Mr. Harris and Ms. Daddeh's emotional distress caused them to suffer physical harm.

102. Specifically, in the three (3) years since Mr. Harris's death, Ms. Daddeh has endured daily, intense physical and emotional pain because of the loss of her son. Trauma resulting from her son's death combined with the daily physical and emotional pain has negatively affected Ms. Daddeh's physical and mental health and resulted in intense pain and suffering. She has endured intense anxiety, depression, stress, and physical and emotional pain. She has had difficulty sleeping, eating, working, and socializing.

103. A reasonable person in Mr. Harris and Ms. Daddeh's position would also have experienced emotional distress.

## Count 8
### Negligence against all Defendants

104. Ms. Daddeh incorporates by reference all prior paragraphs.

105. Defendants owed a duty of care to Mr. Harris.

106. Specifically, once Defendants intended to take Mr. Harris into custody and pursued him in order to do so, they owed a duty of care to Mr. Harris such that they were required to prevent Mr. Harris from experiencing serious bodily harm or death as a result of their custody or pursuit and to rescue him once he faced serious bodily harm or death as a result of their custody or pursuit.

107. Defendants breached that duty.

108. Mr. Harris was harmed because of Defendants' breach of duty.

## Count 9
### Gross negligence against all Defendants

109. Ms. Daddeh incorporates by reference all prior paragraphs.

110. Defendants owed a duty of care to Mr. Harris.

111. Specifically, once Defendants intended to take Mr. Harris into custody and pursued him in order to do so, they owed a duty of care to Mr. Harris such that they were required to prevent Mr. Harris from experiencing serious bodily harm or death as a result of their custody or pursuit and to rescue him once he faced serious bodily harm or death as a result of their custody or pursuit.

112. Defendants breached that duty in a willful, wanton, reckless, or grossly negligent manner.

113. Mr. Harris was harmed because of Defendants' breach of duty.

## Count 10
### Civil rights conspiracy under 42 U.S.C. § 1985(3) against all Defendants

114. Ms. Daddeh incorporates by reference all prior paragraphs.

115. Defendants engaged in a common design or agreement, express or otherwise.

116. The purpose of the common design or agreement was to deprive Mr. Harris and/or Ms. Daddeh of the equal protection of the laws.

117. One or more of the Defendants engaged in an overt act in furtherance of the common design or agreement.

118. Mr. Harris and/or Ms. Daddeh was injured as a result of the common design or agreement and/or the overt act in furtherance of the common design or agreement and/or Mr. Harris and/or Ms. Daddeh was deprived of a constitutionally protected right as a result of the common design or agreement and/or the overt act in furtherance of the common design or agreement.

### Count 11
### Coercive common law conspiracy against all Defendants

119. Ms. Daddeh incorporates by reference all prior paragraphs.

120. Defendants acted in unison with a peculiar power of coercion over Mr. Harris and Ms. Daddeh which they would not have had if they were acting individually.

### Count 12
### Joint liability common law conspiracy against all Defendants

121. Ms. Daddeh incorporates by reference all prior paragraphs.

122. Two or more of the Defendants engaged in a common design or agreement, express or otherwise, to commit a wrongful act.

123. One or more of the Defendants committed a tortious act in furtherance of the common design or agreement.

### Count 13
### Deliberate indifference under 42 U.S.C. § 1983 against all Defendants

124. Ms. Daddeh incorporates by reference all prior paragraphs.

125. Defendants had knowledge of facts from which they were able to draw the inference that a substantial risk of serious harm existed.

126. Despite that knowledge, Defendants did not act to alleviate the substantial risk of serious harm.

127. Both Mr. Harris and Ms. Daddeh were subjected to serious harm as a result.

### Count 14
**_Monell_ claim against the Institutional Defendants for an official policy or custom**

128. Ms. Daddeh incorporates by reference all prior paragraphs.

129. The Institutional Defendants both have official policies or customs in place.

130. The policies or customs amounted to deliberate indifference to the rights of the persons with whom the John Doe Defendants came into contact.

131. The John Doe Defendants acted pursuant to these official policies or customs.

132. Mr. Harris was harmed and deprived of his constitutional rights as a result.

### Count 15
**_Monell_ claim against the Institutional Defendants for failure to train or supervise**

133. Ms. Daddeh incorporates by reference all prior paragraphs.

134. The Institutional Defendants both failed to properly train and/or supervise the John Doe Defendants.

135. The failure to properly train and/or supervise amounted to deliberate indifference to the rights of the persons with whom the John Doe Defendants came into contact.

136. The John Doe Defendants acted without proper training and/or supervision.

137. Mr. Harris was harmed and deprived of his constitutional rights as a result.

### Count 16
**Failure to train or supervise against the Institutional Defendants under G.L. c. 258, § 2**

138. Ms. Daddeh incorporates by reference all prior paragraphs.

139. The Institutional Defendants both failed to properly train and/or supervise the John Doe Defendants.

140. The failure to properly train and/or supervise amounted to deliberate indifference to the rights of the persons with whom the John Doe Defendants came into contact.

141. The John Doe Defendants acted without proper training and/or supervision.

142. Mr. Harris was harmed and deprived of his constitutional rights as a result.

### Count 17
### Excessive force under 42 U.S.C. § 1983 against Defendant-Officer John Doe 1

143. Ms. Daddeh incorporates by reference all prior paragraphs.

144. During all events described in the early morning of December 19, 2020, Defendant-Officer John Doe 1 was acting under color of state law as an on-duty LPD police officer.

145. Defendant-Officer John Doe 1 used force on Mr. Harris which was unreasonable under all the circumstances.

146. As a result of Defendant-Officer John Doe 1's use of excessive force, Mr. Harris was denied his rights as guaranteed under the Fourth Amendment to the Constitution of the United States.

### Count 18
### Excessive force under G.L. c. 12, § 11I, against Defendant-Officer John Doe 1

147. Ms. Daddeh incorporates by reference all prior paragraphs.

148. During all events described in the early morning of December 19, 2020, Defendant-Officer John Doe 1 was acting under color of state law as an on-duty LPD police officer.

149. Defendant-Officer John Doe 1 used force on Mr. Harris which was unreasonable under all the circumstances.

150. Consequently, Defendant-Officer John Doe 1 interfered with or attempted to interfere with Mr. Harris's exercise and enjoyment of rights as guaranteed under the Constitution of the United States and the Constitution of the Commonwealth of Massachusetts.

**Count 19**
**Assault and battery against Defendant-Officer John Doe 1**

151. Ms. Daddeh incorporates by reference all prior paragraphs.

152. Defendant-Officer John Doe 1 intended to cause harmful or offensive contact with Mr. Harris.

153. A harmful or offensive contact of Mr. Harris directly or indirectly resulted from Defendant-Officer John Doe 1's actions and intent.

154. WHEREFORE, Ms. Daddeh respectfully requests the Court grant the following forms of relief:

a. Enter judgment in favor of Ms. Daddeh and against the Defendants on all counts of the Complaint;

b. Award compensatory and punitive damages in an amount to be determined by a jury;

c. Award Ms. Daddeh attorneys' fees, costs, and interest as permitted by law; and

d. Grant such further and other relief as may be just and proper.

**Demand for Jury Trial**

155.     Ms. Daddeh demands a trial by jury on all claims and issues.

Dated:  December 17, 2023
        Boston, Massachusetts

Respectfully submitted,

*/s/ Joshua O'Neill*

Joshua O'Neill, Esq.
BBO# 704512
617.356.7784
josh@bostondefender.com

The Boston Defender
www.bostondefender.com
100 Cambridge Street
14th Floor
Boston, MA 02114